# EXHIBIT B

Dockets.Justia.com



## Whois Record for Wikileaks.org  ( Wiki Leaks )

### Front Page Information

| | |
|---|---|
| **Website Title:** | Wikileaks - Wikileaks |
| **Title Relevancy** | 100% |
| **AboutUs:** | Wiki article on Wikileaks.org |
| **SEO Score:** | 76% |
| **Terms:** | 1031 (Unique: 663, Linked: 732) |
| **Images:** | 8 (Alt tags missing: 8) |
| **Links:** | 289   (Internal: 278, Outbound: 8) |

### Indexed Data

| | |
|---|---|
| **Y! Directory:** | 1 listings |
| **Visitors by Country:** | United States 50.9%    United Kingdom 9.1% |
| | Canada 7.7%    Germany 5.5% |
| | Australia 1.8%    Spain 1.8% |
| **Visitors by City:** | 1) San Francisco, CA, US 6.4% |
| | 2) New York, NY, US 5.5% |
| | 3) Los Angeles, CA, US 2.9% |
| **Alexa Trend/Rank:** | #114,481 ⬇ 22,712 ranks over the last three months. |
| **Compete Rank:** | #41,895 with 40,622 U.S. visitors per month |
| **Quantcast Rank:** | #98,268 |
| **Wikipedia:** | Listed on 12 pages |

### Registry Data

| | |
|---|---|
| **Created:** | 2006-10-04 |
| **Expires:** | 2008-10-04 |
| **Whois Server:** | whois.pir.org |

### Server Data

| | |
|---|---|
| **IP Address:** | 88.80.13.160  [W] [R] [P] [D] [T] |
| **IP Location** | - Stockholm - Stockholm - Prq Inet - Access |
| **Response Code:** | 200 |
| **Blacklist Status:** | Clear |
| **SSL Cert:** | secure.wikileaks.org expires in 113 days. |
| **Domain Status:** | Registered And Active Website |

### DomainTools Exclusive

**Registrant Search:** "John Shipton c/o Dynadot Privacy" owns about 9

**Thumbnail:**



Queue this Domain for Update

### SEO Text Browser

Loading...    SEO Text Browser

**Wikileaks**
From Wikileaks
Jump to: navigation, search

**English** • العربية • Deutsch • Español
• Français • 日本語 • 한국어 • Norsk
(bokmål) • Português • Русский • Türkçe
• Українська •

• Africa • Asia • Europe • Islands • Latin
America • Middle East • North America •
Oceania •

" ... could become as important a
journalistic tool
as the Freedom of Information Act.

— Time Magazine

Wikileaks

http://www.wikileaks.org
Disable SEO Text Browser ( Beta )

### Other TLDs

**.com**   **.net**   **.org**   **.biz**

<u>other domains</u>

**Email Search:** privacy@dynadot.com is associated with about 15,493 domains

**NS History:** 4 changes on 4 unique name servers over 2 years.

**IP History:** 8 changes on 7 unique name servers over 2 years.

**Whois History:** 53 records have been archived since 2006-12-20.

**Dedicated Hosting:** wikileaks.org is hosted on a dedicated server.

**Monitor Domain:** Set Free Alerts on wikileaks.org

**Free Tool:** Download DomainTools for Windows

## Whois Record

```
Domain ID:D130035267-LROR
Domain Name:WIKILEAKS.ORG
Created On:04-Oct-2006 05:54:19 UTC
Last Updated On:23-Apr-2007 12:58:38 UTC
Expiration Date:04-Oct-2008 05:54:19 UTC
Sponsoring Registrar:Dynadot, LLC (R1266-LROR)
Status:OK
Registrant ID:CP-13000
Registrant Name:John Shipton c/o Dynadot Privacy
Registrant Street1:PO Box 701
Registrant Street2:
Registrant Street3:
Registrant City:San Mateo
Registrant State/Province:CA
Registrant Postal Code:94401
Registrant Country:US
Registrant Phone:+1.6505851961
Registrant Phone Ext.:
Registrant FAX:
Registrant FAX Ext.:
Registrant Email: privacy@dynadot.com
Admin ID:CP-13000
Admin Name:John Shipton c/o Dynadot Privacy
Admin Street1:PO Box 701
Admin Street2:
Admin Street3:
Admin City:San Mateo
Admin State/Province:CA
Admin Postal Code:94401
Admin Country:US
Admin Phone:+1.6505851961
Admin Phone Ext.:
Admin FAX:
Admin FAX Ext.:
Admin Email: privacy@dynadot.com

Tech ID:CP-13000
Tech Name:John Shipton c/o Dynadot Privacy
Tech Street1:PO Box 701
Tech Street2:
Tech Street3:
Tech City:San Mateo
Tech State/Province:CA
Tech Postal Code:94401
Tech Country:US
Tech Phone:+1.6505851961
Tech Phone Ext.:
Tech FAX:
Tech FAX Ext.:
Tech Email: privacy@dynadot.com

Name Server:NS1.EVERYDNS.NET
Name Server:NS2.EVERYDNS.NET
Name Server:NS3.EVERYDNS.NET
Name Server:NS4.EVERYDNS.NET
```

**Symbol Key**

Available

Available (Previously registered)

Registered (Active website)

Registered (Parked or redirected)

Registered (No website)

On-Hold (Generic)

On-Hold (Redemption Period)

On-Hold (Pending Delete)

Monitor

Preview

No preview

Buy this (Available)

Buy this (Bid at auction)

**Back Order**

Set a backorder so you can own wikileaks.org when it becomes availabl

**Customize This Page**

Select the items you want to be sho on this page.

☑ Front Page  ☑ Indexed Data

☑ Server Data  ☑ Registry Data

☑ Exclusive Data ☑ Whois Record

**Domains for Sale**

**Domain**

PreventLeaks.com

GameLeaks.com

LineLeaks.com

EndLeaks.com

Leaks.info

PipelineLeaks.com

PressLeaks.com

Leaks.org

BuildingLeaks.com

Leaks.de

WindowLeaks.com

**Compare Similar Domains**

**Domain**

Wiki Learn

Wiki Le

Wiki Learner

Wiki Lead

Wiki Learners

Wiki Leadership

Wiki Leads

Wiki Learing


EXHIBIT B PAGE 68

| Name Server: | | Wiki Lear Ming | 2006-11- |
| Name Server: | | Wiki Lean | 2007-01- |
| Name Server: | | Wiki Leaks | 2007-01- |
| Name Server: | | Wiki Leak | 2007-01- |
| Name Server: | | Wiki Leak Sorg | 2007-02- |
| Name Server: | | Wiki Leakes | 2007-02- |
| Name Server: | | Wiki League | 2007-02- |
| Name Server: | | | |
| Name Server: | | | |

EXHIBIT B PAGE 69

# EXHIBIT C

## EMPLOYMENT AGREEMENT

**THIS AGREEMENT** is made with effect from the 1st day of September 2002 and replaces the Assignment as Chief Operating Officer agreement dated September 1, 1999.

BETWEEN:

(1)     Julius Baer Bank and Trust Company Ltd. of Windward III, Third Floor, Safehaven Corporate Centre, West Bay Road, P.O. Box 1100GT, Grand Cayman, Cayman Islands ("the Employer")

AND:

(2)     Rudolf Elmer of George Town, Grand Cayman, Cayman Islands ("the Employee")

NOW IT IS AGREED as follows:

1.      **Interpretation**

In this agreement:

1.1     unless the context otherwise requires words importing one gender include all other genders and words importing the singular include the plural and vice-versa.

1.2     any reference to a statutory provision shall be deemed to include a reference to any statutory modification or re-enactment of it;

1.3     the clause headings do not form part of this Agreement and shall not be taken into account in its construction or interpretation.

EXHIBIT C PAGE 70

1.4      References in this Agreement to any clause sub-clause schedule or paragraph without further designation shall be construed as references to the clause sub-clause schedule or paragraph of this Agreement so numbered.

## 2.      Job Title

2.1      The Employer shall employ the Employee from September 1, 2002 in the capacity of Senior Vice President and Chief Operating Officer at SafeHaven Corporate Centre, West Bay Road, Grand Cayman or such other location within the Cayman Islands as the Employer may determine from time to time. The Employee's terms and conditions of employment contained herein are (unless herein expressly excluded) supplemented by the Employee Guidelines dated 10th May 2001 as modified by the Employer from time to time (the "Employee Guidelines").

2.2      In addition to the duties which this job normally entails (a description of which is attached hereto signed by both parties and marked Annex A) the Employee may from time to time be required to undertake additional or other duties as necessary to meet the needs of the Employer's business.

## 3.      Remuneration

The Employer shall pay the Employee by Bank Transfer at the rate of US$190,000.00 per year payable by equal monthly installments in arrears on or around the 25th day of each calendar month, which shall be reviewed by the Employer in January of each year and the salary rate may, at the discretion of the Employer, be increased with effect from any such review date. In addition, the Employer may at its discretion review the Employee's salary rate at such other date as the Employer shall deem appropriate. Any proposed increase in the salary rate from time to time shall be communicated by the Employer to the Employee in writing. The Employee may be entitled to receive a bonus at a rate to be decided by the Employer from time to time. Bonus payments will normally be paid in

EXHIBIT C PAGE 71

February in each year. The Employer reserves the right to end or amend the bonus scheme without notice at any time.

## 4. Hours of Employment

4.1 The Employee's normal hours of employment shall be from 8.30am to 5.00 pm on Monday to Friday (inclusive) during which one hour may be taken for lunch.

4.2 The Employee may be required to work such hours outside normal hours of employment as the Employer considers necessary to meet the needs of the business and the Employee shall not be paid for such further hours.

## 5. Holidays

The Employee shall (in addition to the usual public holidays) be entitled to paid holidays in accordance with the Employee Guidelines.

## 6. Sickness

6.1 In the event of absence on account of sickness or injury the Employee (or someone on his behalf) must inform the Employer of the reason for the Employee's absence as soon as possible and must do so no later than the end of the working day on which absence first occurs.

6.2 In respect of absence lasting two or fewer calendar days the Employee is not required to produce a medical certificate unless specifically so requested by the Employer.

6.3 In respect of absence lasting more than two calendar days the Employee must on the earlier of the eighth calendar day of absence or immediately on his return to work provide

EXHIBIT C PAGE 72

the Employer with a medical certificate stating the reason for absence and thereafter provide a like certificate each week or at such intervals as may be determined by the Employer to cover any subsequent period of absence and/or, at the discretion of the Employer, to undergo a medical examination.

6.4   The Employee will be paid his normal basic remuneration for ten working days in total in any one calendar year for absence from work due to illness. Entitlement to payment is subject to notification of absence and production of medical certificates in accordance with clauses 6.1 to 6.3 above.

## 7.   Pension

The Employee shall be entitled on commencement of employment to become and remain a member of the Employer's pension scheme (a description of which is contained in the Employee Guidelines) and the Employer shall be entitled to retain out of each monthly payment of salary due to the Employer under this Agreement the amount attributable to contributions due from the Employee under the terms of the pension scheme.

## 8.   Insurance

The Employer shall pay the annual premium in a medical expenses insurance scheme for the Employee and the Employee's spouse (if unemployed) and children while aged under 18 years and (without obligation) for the disability and for the death of the Employee in accordance with the Employee Guidelines.

## 9.   Discipline

The disciplinary rules applicable to the Employee are contained in the Employee Guidelines.

EXHIBIT C PAGE 73

## 10.   Termination of Employment

10.1   The Employer shall have the right to terminate the Employee's employment immediately without notice or payment in lieu of notice if:

    10.1.1   the Employee is guilty of serious misconduct within the meaning of Section 50(1) of the Labour Law (1996 Revision) (as amended) (the "Law").

    10.1.2   the Employee is guilty of misconduct following the receipt of a written warning within the meaning of Section 50(3) of the Law.

    10.1.3   the Employee has failed to perform his duties in a satisfactory manner following the receipt of a written warning within the meaning of Section 52(1) of the Law.

    10.1.4   the Employee is otherwise in serious breach of the Employee Guidelines.

## 11   Confidentiality

The Employee shall not at any time during his employment (except so far as is necessary and proper in the course of his employment) or at any time after his employment has terminated disclose to any person any information as to the practice, business, dealings or affairs of the Employer or any of the Employer's customers or clients or as to any other matters which may come to his knowledge by reason of his employment.

EXHIBIT C PAGE 74

## 12    Entire Understanding

Except for the Employee Guidelines and the memorandum dated September 16, 2002 to the Employee from Bernhard Hodler and Roland Haas, this Agreement contains the entire understanding between the parties and supersedes all previous agreements and arrangements (if any) relating to the employment of the Employee by the Employer.

## 13   Variation

No variation or amendment of this Agreement or oral promise or commitment related to it shall be valid unless committed to in writing and signed by or on behalf of both parties.

## 14    Governing Law and Jurisdiction

14.1    This Agreement shall be governed by and construed in accordance with Cayman Islands law.

14.2 The parties to this Agreement submit to the exclusive jurisdiction of the Cayman Islands Labour Tribunals and Courts.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement the day and year above written.

**Julius Baer Bank and Trust Company Ltd.**
by: **Walter Knabenhans**

**Charles Farrington**

**Rudolf Elmer**     10/03/02

ORW\KXM\999999\562744\C27S01!
09 September, 2002

EXHIBIT C PAGE 75

# EXHIBIT D

# CONFIDENTIAL RELATIONSHIPS (PRESERVATION) LAW

## (LAW 16 OF 1976)

### (1995 Revision)

1.    This Law may be cited as the Confidential Relationships (Preservation) Law (1995 Revision).

*Short title*

2.    In this Law, unless the context otherwise requires-

*Definitions*

"bank", "licensee" and "trust company" have the meanings ascribed to them in the Banks and Trust Companies Law, 1989;

*Law 4 of 1989*

"business of a professional nature" includes the relationship between a professional person and a principal, however the latter may be described;

"confidential information" includes information concerning any property which the recipient thereof is not, otherwise than in the normal course of business, authorised by the principal to divulge;

"criminal" in relation to an offence means an offence contrary to the criminal law of the Islands;

"Governor" means the Governor in Council;

"Inspector" means the Inspector of Financial Services appointed under section 12(1) of the Banks and Trust Companies Law, 1989 and includes any officer of his department acting under his authority;

"normal course of business" means the ordinary and necessary routine involved in the efficient carrying out of the instructions of a principal including compliance with such laws and legal process as arises out of and in connection therewith and the routine exchange of information between licensees;

"principal" means a person who has imparted to another confidential information in the course of the transaction of business of a professional nature;

"professional person" includes a public or government official, a bank, trust company, an attorney-at-law, an accountant, an estate agent, an insurer, a broker and every kind of commercial agent and adviser whether or not answering to the above descriptions and whether or not licensed or authorised to act in that



EXHIBIT D PAGE 76

capacity and every person subordinate to or in the employ or control of such person for the purpose of his professional activities; and

"property" includes every present, contingent and future interest or claim direct or indirect, legal or equitable, positive or negative, in any money, moneys worth, realty or personalty, movable or immovable, rights and securities thereover and all documents and things evidencing or relating thereto.

Application and scope 3. (1) Subject to subsection (2), this Law has application to all confidential information with respect to business of a professional nature which arises in or is brought into the Islands and to all persons coming into possession of such information at any time thereafter whether they be within the jurisdiction or thereout.

(2) This Law has no application to the seeking, divulging or obtaining of confidential information-

(a) in compliance with the directions of the Grand Court pursuant to section 4;

(b) by or to-

(i) any professional person acting in the normal course of business or with the consent, express or implied, of the relevant principal;

(ii) a constable of the rank of Inspector or above investigating an offence committed or alleged to have been committed within the jurisdiction;

(iii) a constable of the rank of Inspector or above, specifically authorised by the Governor in that behalf, investigating an offence committed or alleged to have been committed outside the Islands which offence, if committed in the Islands, would be an offence against its laws;

(iv) the Financial Secretary, the Inspector or, in relation to particular information specified by the Governor, such other person as the Governor may authorise;

(v) a bank in any proceedings, cause or matter when and to the extent to which it is reasonably necessary for the protection of the bank's interest, either as against its customers or as against third parties in respect of transactions of the bank for, or with, its customer; or

(vi) the relevant professional person with the approval of the Financial Secretary when necessary for the protection of himself or any other person against crime; or

6



(c) in accordance with this or any other Law.

4. (1) Whenever a person intends or is required to give in evidence in, or in connection with, any proceeding being tried, inquired into or determined by any court, tribunal or other authority (whether within or without the Islands) any confidential information within the meaning of this Law, he shall before so doing apply for directions and any adjournment necessary for that purpose may be granted.

Directions regarding the giving in evidence of confidential information

(2) Application for directions under subsection (1) shall be made to, and be heard and determined by, a Judge of the Grand Court sitting alone and *in camera*. At least seven days' notice of any such application shall be given to the Attorney-General and, if the Judge so orders, to any person in the Islands who is a party to the proceedings in question. The Attorney-General may appear as *amicus curiae* at the hearing of any such application and any party on whom notice has been served as aforesaid shall be entitled to be heard thereon, either personally or by counsel.

(3) Upon hearing an application under subsection (2), a Judge shall direct-

    (a) that the evidence be given;
    (b) that the evidence shall not be given; or
    (c) that the evidence be given subject to conditions which he may specify whereby the confidentiality of the information is safeguarded.

(4) In order to safeguard the confidentiality of a statement, answer or testimony ordered to be given under subsection (3) (c), a Judge may order-

    (a) divulgence of the statement, answer or testimony to be restricted to certain named persons;
    (b) evidence to be taken *in camera*; and
    (c) reference to the names, addresses and descriptions of any particular persons to be by alphabetical letters, numbers or symbols representing such persons the key to which shall be restricted to persons named by him.

(5) Every person receiving confidential information by operation of subsection (2) is as fully bound by this Law as if such information had been entrusted to him in confidence by a principal.

(6) In considering what order to make under this section, a Judge shall have regard to-

7

    (a)   whether such order would operate as a denial of the rights of any person in the enforcement of a just claim;

    (b)   any offer of compensation or indemnity made to any person desiring to enforce a claim by any person having an interest in the preservation of secrecy under this Law; and

    (c)   in any criminal case, the requirements of the interests of justice.

(7)  In this section, unless the context otherwise requires—

<div style="margin-left:2em"><em>Law 13 of 1978</em></div>

"court" bears the meaning ascribed to it in section 2 of the Evidence Law;

"given in evidence" and its cognates means make a statement, answer an interrogatory or testify during or for the purposes of any proceeding; and

"proceeding" means any court proceeding, civil or criminal and includes a preliminary or interlocutory matter leading to or arising out of a proceeding.

<div style="margin-left:2em"><em>Offences and penalties</em></div>

5.   (1)  Subject to section 3(2), whoever—

    (a)   being in possession of confidential information however obtained—

        (i)   divulges it; or

        (ii)  attempts, offers or threatens to divulge it; or

    (b)   wilfully obtains or attempts to obtain confidential information,

is guilty of an offence and liable on summary conviction to a fine of five thousand dollars and to imprisonment for two years.

(2)  Whoever commits an offence under subsection (1) and receives or solicits on behalf of himself or another any reward for so doing is liable to double the penalty therein prescribed and to a further fine equal to the reward received and also to forfeiture of the reward.

(3)  Whoever, being in possession of confidential information, clandestinely, or without the consent of the principal, makes use thereof for the benefit of himself or another, is guilty of an offence and liable on summary conviction to the penalty prescribed in subsection (2), and for that purpose any profit accruing to any person out of any relevant transaction shall be regarded as a reward.

(4)  Whoever being a professional person, entrusted as such with confidential information, the subject of the offence, commits an offence under subsection (1), (2) or (3) is liable to double the penalty therein prescribed.

<div style="text-align:center">8</div>





(5)   Fore the removal of doubt it is declared that, subject to section 3(2), a bank which gives a credit reference in respect of a customer without first receiving the authorisation of that customer is guilty of an offence under subsections (1) and (4).

6.    The Governor may make regulations for the administration of this Law.          Regulations

7.    No prosecution shall be instituted under this Law without the consent of the          Attorney-General's fiat
Attorney-General.

Publication in consolidated and revised form authorised by the Governor in Council this 7th day of February, 1995.

Carmena H. Parsons
Acting Clerk of Executive Council

9

# EXHIBIT E

# FEDERAL LAW ON BANKS AND SAVINGS BANKS
## (Law on banks, LB)[1]

of November 8, 1934 (Language of December 27, 2006)

---

*The Federal Assembly of the Swiss Confederation,*
pursuant to Articles 34[ter], 64 and 64[bis] of the Constitution[2],
after examination of the message of the Federal Council of February 2, 1934[3],

*resolves:*

---

[1] New language according to Ch. I of LF of April 22, 1999, in force since Oct. 1, 1999 (RO **1999** 2405 2408; FF **1998** 3349).
[2] [RS **1** 3; RO **1976** 2001]
[3] FF **1934** I 172

EXHIBIT E PAGE 81

**Art. 47**[124]

1.[125] Any person who, in his capacity as officer, employee, representative or liquidator of a bank, person in charge to investigate or delegate to restructuring appointed by the Banking Commission, or officer or employee of a recognized auditing company, discloses a secret entrusted to him or of which he has become aware thereof in this capacity,

any person who tries to induce others to violate professional secrecy,

shall be punished by imprisonment for not more than six months or by a fine of not more than SFr. 50,000.

2. If the offender acted negligently, the penalty shall be a fine not exceeding SFr. 30,000.

3. The violation of professional secrecy remains punishable even after the termination of the employment relationship or if the holder of the secret no longer practices his profession.

4. Still applicable are the Federal and Cantonal regulations concerning the obligation to provide information to the authorities and testify in court.

---

[124] New language according to Ch. I of LF of March 11, 1971, in force since July 1, 1971 (RO **1971** 808 825 art. 1; FF **1970** I 1157).
[125] New language according to Ch. I of LF of Oct. 3, 2003, in force since July 1, 2004 (RO **2004** 2767 2776; FF **2002** 7476).


EXHIBIT E PAGE 82

# Loi fédérale
## sur les banques et les caisses d'épargne
### (Loi sur les banques, LB)[1]

du 8 novembre 1934 (Etat le 27   décembre 2006)

*L'Assemblée fédérale de la Confédération suisse,*
vu les art. 34[ter], 64 et 64[bis] de la constitution[2],
vu le message du Conseil fédéral du 2 février 1934[3],
*arrête:*

## Chapitre I    Champ d'application de la loi

### Art. 1[4]

[1] La présente loi régit les banques, les banquiers privés (raisons individuelles, sociétés en nom collectif et sociétés en commandite) et les caisses d'épargne. Toutes ces entreprises sont désignées ci-après sous le nom de banques.

[2] Les personnes physiques ou morales qui ne sont pas assujetties à la présente loi ne peuvent accepter des dépôts du public à titre professionnel. Le Conseil fédéral peut prévoir des exceptions si la protection des déposants est garantie. L'émission d'emprunts n'est pas considérée comme acceptation de dépôts du public à titre professionnel.[5]

[3] La présente loi ne s'applique notamment pas:

    a.   aux agents de change et aux maisons de bourse qui se bornent à négocier les valeurs mobilières et à effectuer les opérations qui s'y rapportent directement, sans exercer d'activité bancaire;

    b.   aux gérants de fortune, aux notaires et aux agents d'affaires qui se bornent à administrer les fonds de leurs clients sans exercer d'activité bancaire.

[4] Seuls les établissements qui ont reçu une autorisation de la Commission fédérale des banques (dénommée ci-après «Commission des banques») en tant que banques peuvent faire figurer le terme de «banque» ou de «banquier» dans leur raison sociale

---

RO 51 121 et RS 10 325
[1]   Nouvelle teneur selon le ch. I de la LF du 22 avril 1999, en vigueur depuis le 1er oct. 1999 (RO 1999 2405 2408; FF 1998 3349).
[2]   [RS 1 3; RO 1976 2001]
[3]   FF 1934 I 172
[4]   Nouvelle teneur selon le ch. I de la LF du 11 mars 1971, en vigueur depuis le 1er juillet 1971 (RO 1971 808 825 art. 1 ; FF 1970 I 1157).
[5]   Nouvelle teneur selon le ch. I de la LF du 18 mars 1994, en vigueur depuis le 1er fév. 1995 (RO 1995 246 252; FF 1993 I 757). Voir aussi les disp. fin. de cette modification, à la fin du présent texte.

EXHIBIT E PAGE 83

d.  aura indûment utilisé, dans sa raison sociale, dans la désignation du but social ou dans sa publicité, le terme de «banque», de «banquier» ou d'«épargne»;

e.  aura fait une publicité trompeuse ou se sera prévalu du siège suisse de la banque ou d'institutions suisses pour faire une publicité abusive;

f.[121] aura indûment accepté des dépôts du public ou des dépôts d'épargne;

g.  aura constitué un nouveau droit de gage sur nantissement ou placé ce gage en report, contrairement aux dispositions de l'art. 17;

h.  ...[122]

i.[123] aura donné de faux renseignements à la Commission des banques ou à l'organe de révision;

k.  aura, en exécutant le contrôle ou en établissant le rapport y afférent, violé de manière grossière les obligations que la présente loi ou les dispositions d'exécution lui assignent en qualité d'organe de révision agréé, et aura en particulier fourni dans le rapport de révision de fausses indications ou dissimulé des faits importants ou encore omis d'adresser à la banque ayant fait l'objet de la révision le rappel prescrit par la loi ou d'établir le rapport qu'il doit présenter à la Commission des banques;

l.  n'aura pas dûment tenu les livres ni conservé les livres et les pièces justificatives conformément aux prescriptions;

sera puni de l'emprisonnement pour six mois au plus ou de l'amende jusqu'à concurrence de 50 000 francs.

[2] Si le délinquant a agi par négligence, la peine sera l'amende jusqu'à concurrence de 30 000 francs.

**Art. 47**[124]

[1].[125] Celui qui en sa qualité de membre d'un organe, d'employé, de mandataire ou de liquidateur de la banque, de chargé d'enquête ou de délégué à l'assainissement nommé par la Commission des banques, ou encore de membre d'un organe ou d'employé d'une institution de révision agréée, aura révélé un secret à lui confié ou dont il avait eu connaissance à raison de sa charge ou de son emploi,

celui qui aura incité autrui à violer le secret professionnel,

---

121  Nouvelle teneur selon le ch. I de la LF du 18 mars 1994, en vigueur depuis le 1er fév. 1995 (RO **1995** 246 252; FF **1993** I 757).
122  Abrogée par le ch. II 5 de l'annexe à la loi du 3 oct. 2003 sur la Banque nationale, avec effet au 1er mai 2004 (RS **951.11**).
123  Nouvelle teneur selon le ch. II 5 de l'annexe à la loi du 3 oct. 2003 sur la Banque nationale, en vigueur depuis le 1er mai 2004 (RS **951.11**).
124  Nouvelle teneur selon le ch. I de la LF du 11 mars 1971, en vigueur depuis le 1er juillet 1971 (RO **1971** 808 825 art. I; FF **1970** I 1157).
125  Nouvelle teneur selon le ch. I de la LF du 3 oct. 2003, en vigueur depuis le 1er juillet 2004 (RO **2004** 2767 2776; FF **2002** 7476).



sera puni de l'emprisonnement pour six mois au plus ou d'une amende de 50 000 francs au plus.

2. Si le délinquant a agi par négligence, la peine sera l'amende jusqu'à concurrence de 30 000 francs.

3. La violation du secret demeure punissable alors même que la charge ou l'emploi a pris fin ou que le détenteur du secret n'exerce plus sa profession.

4. Sont réservées les dispositions de la législation fédérale et cantonale statuant l'obligation de renseigner l'autorité et de témoigner en justice.

### Art. 48[126]

Celui qui, en produisant ou en répandant des allégations qu'il savait fausses, aura porté atteinte au crédit d'une banque ou des centrales d'émission de lettres de gage, ou encore l'aura compromis, sera puni, sur plainte, de l'emprisonnement ou de l'amende.

### Art. 49[127]

[1] Celui qui, intentionnellement:

   a.  n'aura pas établi ou publié les comptes annuels ou les bilans intermédiaires conformément aux prescriptions de l'art. 6;

   b.  n'aura pas soumis ses comptes annuels au contrôle de l'organe de révision agréé ou aura omis de faire procéder à la révision exigée par la Commission des banques;

   c.  n'aura pas rempli ses obligations envers l'organe de révision;

   d.  n'aura pas obtempéré à une injonction de la Commission des banques l'invitant à rétablir l'ordre légal et à supprimer les irrégularités;

   e.[128] aura omis de fournir à la Commission des banques les informations qu'il était tenu de lui communiquer;

   f.  aura remboursé des parts sociales à l'encontre des dispositions de l'art. 12;

sera puni des arrêts ou de l'amende jusqu'à concurrence de 20 000 francs.

[2] Si l'auteur a agi par négligence, la peine sera l'amende jusqu'à concurrence de 10 000 francs.

---

[126]  Nouvelle teneur selon le ch. II 5 de l'annexe à la loi du 3 oct. 2003 sur la Banque nationale, en vigueur depuis le 1er mai 2004 (RS **951.11**).
[127]  Nouvelle teneur selon le ch. I de la LF du 11 mars 1971, en vigueur depuis le 1er juillet 1971 (RO 1971 808 825 art. I; FF 1970 I 1157).
[128]  Nouvelle teneur selon le ch. II 5 de l'annexe à la loi du 3 oct. 2003 sur la Banque nationale, en vigueur depuis le 1er mai 2004 (RS **951.11**).

EXHIBIT E PAGE 85

CERTIFICATE OF ACCURACY

I, Genevieve Light of TransPerfect Translations, Inc. do hereby declare that the following are to the best of my knowledge and belief, within the given parameters, a true and accurate translation of the document *Federal Law on Banks and Savings Banks, Article 47*, translated from French into English.

A copy of the final translation is attached.

I so declare under penalty of perjury under the laws of the State of California on this 24th day of January, 2008.


_Genevieve Light_

Genevieve Light
TransPerfect Translations, Inc.

# EXHIBIT F

# Information theft at Bank Julius Baer

**An anonymous person sends complete data files about well-to-do customers from around the world**

**Customer information from the Baer Group was transmitted anonymously to the CASH editors. Customers seeking greater discretion protection, of all people, were affected. Their total holdings are in the billions.**

*by Leo Mueller*

The CD-ROM in the mail for the editor's desk did not have any indication of the sender, no writing, no logo – mass market goods from a computer shop.

The contents, however, are absolutely not for general consumption: 169 megabytes of files with customer and business information from a money institution, whose world fame is built on secrecy.

The data files come from the office of the Julius Baer Group on the Cayman Islands. They were recorded between 1997 and 2003 and concern the entire business process of the Baer companies on the Caribbean island and a clientele that prefers to have their arrangements handled with particular discretion: very well-to-do private customers from around the world.

These are customers on both sides of the Atlantic, very wealthy heirs, experienced corporate personalities, well-known and less prominent people from political, business, and cultural circles, and even wealthy Swiss citizens.

They had their estate attorneys – or handled this directly themselves – set up foundations, domiciled companies, and trusts to administer their fortunes at the Julius Baer Bank and Trust Company and the Julius Baer Trust Company (Cayman).

These companies generally have their headquarters on Caribbean island nations or on the British Channel Islands. Their accounts, however, are managed at Julius Baer in New York or Zurich, and sometimes at other money institutions. These are the normal constructions of choice for super-wealthy investors to manage their assets scattered around the world.

Juerg Staehelin, communication manager at Julius Baer, explained to CASH: "The residual risk 'employee' can never be fully eliminated at any company despite the latest infrastructure and security measures. For this reason, we try to be very careful when recruiting our employees along with ongoing prevention to minimize this danger. We are working with the police and other authorities closely to clear up this case."

Now they are working flat out to discover who the information thief is. The person under suspicion even had access to the minutes of management meetings, has confidential notes from fund company discussions, and was able to review internal fee calculations and unpublished balance sheet information.



This is a risk that every company must live with, including the finest banking institutions: frustrated employees, fired workers seeking ways to exact revenge, and the losers in back office struggles.

At the Julius Baer Bank, the security staff thought they had considered everything. Bernhard Hodler, chief risk officer, and Giampaolo Trenta, chief security officer, issued "Guidelines for the Secure Handling of Customer and Company Information" to the entire bank group at the end of May. Whether in Zurich or Basel, Dubai or New York, the booklet in CD cassette format is must reading for every employee.

The brochure explains the practical sides for bank customer secrecy. The discussion deals with passwords and virus protection, correct access restrictions for computers and the careful use of notebooks. For example, portfolio managers may only take their laptops on trips abroad with enciphered hard drives.

The experts at the private bank know that like every other bank their institution has become "vulnerable" through the application of IT. They make it clear to employees that hacking and information theft do not just result in financial damages. As they put it in their guidelines: "Often the resulting damage to the reputation can be many times greater and pose a threat to our existence."

**Customer names are stored in many places in the computer network**

Hardly any of the private banking customers can imagine how often his name and information about his accounts or investment vehicles are stored in the money institutions. Sensitive information traces can usually be found in dozens of text files. For example, in fax letters that were sent between the trust administration and the portfolio manager. Or in files with the trust company regulations as well as in lists about loan and investment activity.

Customer relationship managers and investment managers also file away database and spreadsheet files, where the addresses of account holders, attorneys, asset managers, trust managers, and beneficial owners are noted along with the real owners holding disposal authority for the assets. Assistants in the back office prepare inventory sheets for customer safes – with a data copy on the hard drive. This is how one finds the person who drew up a will, for example.

And customer relationship managers, to help remember where what is, draw up organization charts with graphic software for complex, multi-layered investment vehicles. Finally, a name is "on deposit" dozens of times in the computer network.

This would not be dangerous if the information were only accessible to a few employees. However, without information, the bankers could not get any work done. In addition, legal archiving regulations require that a great deal of customer information is saved for a long period.

The data protection dilemma becomes very clear in an everyday problem confronting system administrators: computer viruses. Banks communicate by e-mail with fund administrators, equity managers, communication companies, and naturally with their colleagues in the financial network. These are openings that allow viruses, worms, and Trojan horses opportunities to penetrate the network, damage software and files, and in the worst cases even carry out electronic espionage.



E-mails are enciphered, fax lines are secure. But the data stored on hard drives is more than likely not encrypted, because if it were, data protection programs would not be able to sift through it looking for harmful attacks.

In tasteful brochures, bank secrecy is quickly guaranteed. The rest is up to the computer experts.

## DATA DISASTER

At the beginning of June, UBS in Tokyo reported the loss of a hard drive. This major bank told the media: "The risk of customer data falling into unauthorized hands is minimal, since the data is stored in a special format and very hard to access." This instance, however, was not taken lightly by the corporate executives: "The supervisory authorities were informed about the situation." The customers concerned were also informed. A few days later, the American Citigroup reported that four million customer names on data carriers had disappeared from a freight shipment. A case of lost data at the Bank of America involved 1.2 million customers. Information theft is a growing business. In the USA, criminals robbed customer data from the information company Choicepoint in order to use stolen identities to take out loans or order goods. Choicepoint provides creditworthiness information for the finance industry. Later, a competitor Lexis-Nexis reported the theft of 310,000 customer names. That data theft led to a security debate in the US Senate.

DocID: 1995056

MedialD: 0006

Color: 0

Size: 96602mm²

Topic: 0050380.01

Order: 0050380

Category: Julius Baer Group and other Group companies\Corporate_Management



# Datenklau bei der Bank Julius Bär

**Ein Anonymus verschickt komplette Datensätze über vermögende Kunden aus der ganzen Welt.**

**Kundendaten der Bär-Gruppe wurden der CASH-Redaktion anonym zugestellt. Betroffen sind ausgerechnet Klienten, die erhöhten Diskretionsschutz suchten. Sie verkörpern ein Milliardenvermögen.**

VON LEO MÜLLER

Die CD-ROM in der Redaktionspost enthält kein Zeichen des Urhebers, keine Beschriftung, kein Signet – handelsübliche Massenware aus dem Computershop.

Der Inhalt hingegen ist absolut nicht für den allgemeinen Gebrauch bestimmt: 169 Megabyte Dateien mit Kunden- und Geschäftsdaten eines Geldhauses, dessen Weltruf auf Verschwiegenheit aufbaut.

Die Datensätze stammen aus dem Büro der Julius-Bär-Gruppe auf den Cayman Islands. Sie wurden in den Jahren 1997 bis 2003 erstellt und be-

treffen den gesamten geschäftlichen Ablauf der Bär-Firmen auf der Karibikinsel und eine Kundenklientel, die es gerne besonders vertraulich geregelt hat: sehr vermögende Privatkunden aus der ganzen Welt.

Es sind Kunden dies- und jenseits des Atlantiks, schwerreiche Erben, gestandene Unternehmerpersönlichkeiten, bekannte und weniger prominente Personen aus Politik, Wirtschaft und Kultur, auch wohlhabende Schweizer Bürger.

Sie liessen sich von ihren Anwälten oder direkt von der Julius Baer Bank and Trust Company und der Julius Baer Trust Company (Cayman) Stiftungen, Domizilgesellschaften und Trusts zur Verwaltung ihrer Vermögen einrichten.

Diese Firmen haben in der Regel ihren Sitz in karibischen Inselstaaten oder auf den britischen Kanalinseln. Deren Konti wiederum befinden sich bei Julius Bär in New York oder Zürich, hin und wieder auch bei anderen Geldinstituten. Es

sind die üblichen Konstruktionen, die superreiche Anleger wählen, um ihr weltweit verstreutes Vermögen zu verwalten.

Jürg Stähelin, Kommunikationschef von Julius Bär, erklärt gegenüber CASH: «Das Restrisiko ‹Mitarbeiter› kann kein Unternehmen trotz modernster Infrastruktur und Sicherheitsmassnahmen vollständig ausschliessen. Deshalb versuchen wir mit einer sorgfältigen Rekrutierung unserer Mitarbeiter sowie lau-



**mediagate**    Rietstrasse 15, CH-8108 Dällikon, Tel. +41 1 884'61'11
Fax +41 1 884'61'12, Internet www.media-gate.ch

Ausschnitt / coupure   1/2
Lieferung / livraison   2/4



EXHIBIT F PAGE 90

DocID: 1995056

MediaID: 0006

Color: 0

Topic: 0050380.01  Size: 99602mm²

Order: 0060380

Category: Julius Baer Group and other Group companies\Corporate_Management

fender Prävention diese Gefahr zu minimieren. Zur Klärung des vorliegenden Falles arbeiten wir eng mit der Polizei und anderen Behörden zusammen.»

Nun wird mit Hochdruck nach dem Datendieb geforscht. Die verdächtige Person hatte sogar Zugriff auf die Sitzungsprotokolle des Managements, verfügte über vertrauliche Besprechungsnotizen mit Fondsgesellschaften, konnte interne Gebührenberechnungen und nicht öffentliche Bilanzen einsehen.

Dies ist das Risiko, mit dem jedes Unternehmen leben muss, auch feinste Bankhäuser: frustrierte Mitarbeiter, rachsüchtige Gekündigte, die Verlierer im Backoffice.

Bei der Bär-Bank glaubten die Männer von der Sicherheit, an alles gedacht zu haben. Bernhard Hodler, der Chief Risk Officer, und Giampaolo Trenta, der Chief Security Officer, verschickten erst Ende Mai in der gesamten Bankengruppe einen «Leitfaden für den sicheren Umgang mit Kunden- und Geschäftsdaten». Ob in Zürich oder Basel, in Dubai oder New York, das Heftchen im CD-Hüllen-Format ist Pflichtlektüre für jeden Mitarbeiter.

Die Broschüre klärt über die praktischen Seiten des Bankkundengeheimnisses auf. Von Passwörtern

## DATEN-DESASTER

Anfang Juni meldete die **UBS** in Tokio einen Festplattenverlust. Die Grossbank unterrichtete die Medien: «Das Risiko, dass Kundendaten in unbefugte Hände gelangen, ist gering, da die Daten in einem speziellen Format gespeichert wurden und nur schwer zugänglich sind.» Der Vorfall wurde von den Konzernverantwortlichen dennoch nicht auf die leichte Schulter genommen. Die Aufsichtsbehörden wurden über die Situation informiert.» Auch die betroffenen Kunden wurden

informiert. Tage später berichtete die amerikanische **Citigroup**, dass in der Frachtpost Datenträger mit vier Millionen Kundennamen verschwunden sind. Ein Datenverlust bei der Bank of America betrifft 1,2 Millionen Kunden. Datendiebstahl ist ein Wachstumsgeschäft. In den USA raubten Kriminelle Kundendaten der Auskunftsfirma **Choicepoint**, um mit fremder Identität Darlehen zu erhalten oder Waren zu bestellen. Choicepoint liefert Bonitätsdaten für die Finanzindustrie. Später meldete Konkurrent **Lexis-Nexis** den Raub von 310 000 Kundennamen. Der Datenraub führte zu einer Sicherheitsdebatte im US-Senat.

und vom Virenschutz ist die Rede, vom korrekten Zugangsschutz zu den Computern und vom sorgsamen Umgang mit dem Notebook. So dürfen Portfolio-Manager auf Auslandsreisen ihren Laptop nur mit verschlüsselter Festplatte mitführen.

Die Experten von der Privatbank wissen, dass ihr Institut wie jedes andere Unternehmen durch den IT-Einsatz «verletzlich» geworden ist. Sie geben den Mitarbeitern zu bedenken, dass Hacking und Datendiebstahl nicht nur zu finanziellen Schäden führen. Sie schreiben in ihrem Leitfaden: «Der damit oft einhergehende Reputationsverlust kann um ein Vielfaches grösser und existenzgefährdend sein.»

### Kundennamen sind vielfach im Rechnernetz gespeichert

Kaum ein Kunde im Private Banking macht sich ein Bild davon, wie oft sein Name und Hinweise über seine Konti oder Anlagevehikel in den Geldhäusern gespeichert sind. Sensible Datenspuren sind gewöhnlich in dutzenden von Textdateien zu finden. Zum Beispiel in gespeicherten Faxmitteilungen, die zwischen der Trustverwaltung und dem Portfolio-Manager versandt wurden. Oder in Dateien mit den Reglementen der Trustfirmen sowie in Listen über Kre-

dit- und Investment-Geschäfte.

Kundenbetreuer und Vermögensverwalter legen wiederum Datenbank- und Tabellendateien an, in denen sie die Adressen von Kontinhabern, Anwälten, Asset-Managern, Treuhändern und den «beneficial owners» notieren, den tatsächlich verfügungsberechtigten Eigentümern der Vermögen. Assistenten im Backoffice fertigen Inventarblätter für die Kundensafes – mit Datenkopie auf der Festplatte. So findet man dann zum Beispiel den Verfasser eines Testaments.

Und Kundenbetreuer zeichnen bei komplexen, verschachtelten Anlagevehikeln Organigramme mit der Grafiksoftware – als Gedächtnisstütze. Schliesslich ist der Name dutzendfach im Rechnernetz deponiert.

Dies wäre nicht gefährlich, wenn die Daten nur wenigen Mitarbeitern zugänglich wären. Doch ohne Informationen können die Banker nicht arbeiten. Zudem verlangen gesetzliche Aufbewahrungspflichten, dass viele Kundeninformationen langfristig gespeichert werden.

Besonders deutlich wird das Datenschutz-Dilemma am Alltagsproblem der Systemadministratoren: den Computerviren. Banker kommunizieren per E-Mail mit Fondsverwaltern, Vermögensmanagern, Kommunikationsfirmen und natürlich mit den Kollegen im Firmennetz. So können Viren, «Würmer» und «Trojaner» in die Netze eindringen, die Software und die Daten schädigen, im schlimmsten Fall sogar elektronisch befallen.

E-Mails werden verschlüsselt, Faxleitungen sind sicher. Aber die Datenbestände auf den Festplatten sind häufig nicht kryptiert. Denn sonst könnten Virenschutzprogramme die Dateien nicht auf schädlichen Befall absuchen.

In gediegenen Prospekten ist das Bankkundengeheimnis schnell garantiert. Für den Rest müssen die Computerexperten sorgen.


EXHIBIT F PAGE 91

# EXHIBIT G

**1.)**

| Document title: | BJB_-_R████_de_A████_-_G████_J████_A██_Y█_Trusts |
|---|---|
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_R████_de_A████_-_G████_J A██_Y█_Trusts |
| File Name: | bjb-andrade.zip |
| Wikileaks File Identity No: | SHA256<br>39010e85348a18b7cd091d3dc7b94ffdea076203a08df0d93822a486416b2e3e |
| Wikileaks Release Date: | 2008-01-18 |

**2.)**

| Document title: | BJB_-_L█_N████_-_B███_R████_-_Madrid_-_USD██_mil |
|---|---|
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_L█_N████_-_B███_R█ _-_Madrid_-_USD██_mil |
| File Name: | bjb-luis-avenvas.zip |
| Wikileaks File Identity No: | SHA256<br>eac16b8eb17f21e6cfa496dff61aea1d11bd223739e6f093fb9411df4603cb51 |
| Wikileaks Release Date: | 2008-01-18 |

**3.)**

| Document title: | BJB_-_J██_C████_C██████_-_SF_holdings_-_██_mil |
|---|---|
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_J██_C████_C██████_-_SF_holdings_-_██_mil |
| File Name: | bjb-peru.zip |
| Wikileaks File Identity No: | SHA256<br>ffac47f723724cf36a1f8a015ea81648e70806225fce5af0c182fde6c3480a71 |
| Wikileaks Release Date: | 2008-01-18 |

/ / /

/ / /

EXHIBIT G PAGE 92

/ / /

**EXHIBIT "G"**

4.)

| | |
|---|---|
| Document title: | BJB_-_Mr._L███_-_G████_C███s_L███_-_█avoidance_-_Cayman_-_5_mil |
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_Mr._L███_-_G███_C███_L███_-_█avoidance_-_Cayman_-_█mil |
| File Name: | bjb-lewis2.zip |
| Wikileaks File Identity No: | SHA256 cccdc8fd8e24721470f28b3f25f89a69bbf85999dff354cabeb87571bfe5d4e3 |
| Wikileaks Release Date: | 2008-01-17 |

5.)

| | |
|---|---|
| Document title: | BJB_-_Mr.███_-_G████_C██s_L███_-_█████_of_beneficiary |
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_Mr._L███_-_G███_C██_L███_-_█████_of_beneficiary |
| File Name: | bjb-lewis1.zip |
| Wikileaks File Identity No: | SHA256 e41b7eada762d35555b0493e1fe36235cf3f97d06382479d233140e212f0570c |
| Wikileaks Release Date: | 2008-01-17 |

6.)

| | |
|---|---|
| Document title: | BJB_-_H███_S████,_Frankfurt_Steuerbetrug_EUR_██_mil |
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_H███_S████,_Frankfurt_Steuerbetrug_EUR_██_mil |
| File Name: | bjb-heinri-steinberger.zip |
| Wikileaks File Identity No: | SHA256 51dbed21a2072f3e68c6093c2e08a7e506d0136fba82209eb230dabe32bc51e0 |
| Wikileaks Release Date: | 2008-01-13 |

/ / /

7.)

| Document title: | BJB_-_V█████F███_-_█e█████_Cayman |
|---|---|
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_V█████F███_-_█e█████_Cayman |
| File Name: | schwarze-kasse.zip |
| Wikileaks File Identity No: | SHA256 2409a1953291e9eeec33af0cc949688bf44b3007e2ee77e4ab13496 b3b6fb565 |
| Wikileaks Release Date: | 2008-01-09 |

8.)

| Document title: | BJB_-_J█_P██_-_D████_Trust_-_Cayman_████n_money |
|---|---|
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_J█_P██_-_D████_Trust _-_Cayman_█████_money |
| File Name: | jk-peng.zip |
| Wikileaks File Identity No: | SHA256 f571984e852292cd3cdff4eba2c0a8e4684045440a28fd6dfd700a20 f6f4e9b9 |
| Wikileaks Release Date: | 2008-01-09 |

9.)

| Document title: | BJB_-_S█████████_Offshore_T█_S█████_-_USD_███_mil |
|---|---|
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_S█████████_Offshore_T █_S████_-_USD_███_mil |
| File Name: | bjb-swisspartner-tax-scheme.xls |
| Wikileaks File Identity No: | SHA256 c678a68c006f27651c363ae55c133cfcd3127f99bcea12a4212a6317 8719df41 |
| Wikileaks Release Date: | 2008-01-13 |

/ / /

/ / /

/ / /

/ / /

10.)

| Document title: | BJB _-_ G███s███████_A___K██████_A__Tankers_-_USD_██_mil_per_year |
| --- | --- |
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_G███s██████_A█_K████_A█_Tankers_-_USD_██_mil_per_year |
| File Name: | bjb-alpha-tankers.zip |
| Wikileaks File Identity No: | SHA256 375ebe8f8249c23a32290c6a424680df39f677707d5a449927f15f5a 34c6408c |
| Wikileaks Release Date: | 2008-01-13 |

11.)

| Document title: | BJB_-_S█████████J███_G████████_A██████_-_EUR_██_mil |
| --- | --- |
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_S███████J█████_G████████_A██████_-_EUR_██_mil |
| File Name: | bjb-juergen-grossmann.zip |
| Wikileaks File Identity No: | SHA256 bee41d33756939188dfccbaf5eb824b218225f55ebf91067150d436 2b5f306dc |
| Wikileaks Release Date: | 2008-01-13 |

12.)

| Document title: | BJB_-_W████L████,_New_York_-_USD_██_mil_tax_████ |
| --- | --- |
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_W███n_L████,_New_York_-_USD_██_mil_tax_████ |
| File Name: | bjb-winston-layne.zip |
| Wikileaks File Identity No: | SHA256 bac726339b1423535ac0bb6336312669d139230e3b089e3533204f c185e77855 |
| Wikileaks Release Date: | 2008-01-13 |

/ / /

/ / /

/ / /

**EXHIBIT "G"**

13.)

| Document title: | BJB _- L█_L. K█████_-_China_L██_and_P███ |
|---|---|
| URL Link: | http://www.wikileaks.org/wiki/BJB_-_L█_L._K█████_-_C█_L██_and_P█ |
| File Name: | bjb-lord-kadoorie.zip |
| Wikileaks File Identity No: | SHA256 59cc8c9575a07e1928bc4117059d6e74be404c75b666c9dbbdf2c09 4e45f1c69 |
| Wikileaks Release Date: | 2008-01-13 |

14.)

| Document title: | Julius_Baer_to_Angela_Merkel Description: Forged Letter to Angela Merkel from Bank Julius Baer, dated 12 Sept 2007 |
|---|---|
| URL Link: | http://www.wikileaks.org/wiki/Julius_Baer_to_Angela_Merkel |
| File Name: | angela-merkel.pdf |
| Wikileaks File Identity No: | SHA256 5f201de05f3d8eb32c0a961402be4324b05cea803d58382c0ca814e 85dee34ab |
| Wikileaks Release Date: | 2007-11-26 |

**EXHIBIT "G"**