Joshua Koltun (Bar No. 173040)
Attorney
101 California Street
Suite 2450, No. 500
San Francisco, California 94111
Telephone: 415.680.3410
Facsimile: 866.462.5959
joshua@koltunattorney.com

Attorney for purported "Related Third Party"
and/or purported Defendant Daniel Mathews

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BANK Julius Baer & CO. LTD, a Swiss Entity; and Julius Baer BANK AND TRUST CO. LTD, a Cayman Islands entity,<br><br>        Plaintiffs,<br><br>        v.<br><br>WIKILEAKS, an entity of unknown form, WIKILINKS.ORG, an entity of unknown form; DYNADOT, LLC, a CALIFORNIA limited liability corporation, and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.: CV08-0824 JSW<br><br>DANIEL MATHEWS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE TEMPORARY RESTRAINING ORDER, PROPOSED PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION<br><br>Date:  February 29, 2008<br>Time:  9:00 am<br>Court:  2<br>Judge:  Hon. Jeffrey S. White<br><br>Documents Filed Herewith<br>    1. Declaration of Daniel Mathews<br>    2. Declaration of Nicole Fritz |

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS..................................................................................................................i

*INTRODUCTION AND SUMMARY OF ARGUMENT* ........................................................1

*FACTUAL AND PROCEDURAL BACKGROUND* ............................................................2

*ARGUMENT* ..........................................................................................................................6

   *I. Mathews Has Standing to Challenge the Permanent Injunction and the TRO as Prior Restraints Upon His Rights and the Rights of Others to Speak and to Receive Information.*6

   *II. The Injunctions Impose an Impermissible Prior Restraint on Mathews and Others Who Seek To Contribute To, and Communicate Through, the Wikileaks Site* ..............................8

     *A. Prior Restraints On Speech Face a "Heavy Presumption of Invalidity."* ...........................8

     *B. The Interest of Offshore Tax Havens In Maintaining Bank Secrecy Cannot Possibly Constitute A Sufficient Interest to Impose a Prior Restraint* ..................................9

     *C. There Cannot Be a Compelling Interest In Restraining Mathews' or Others' Speech Where, as Here, Such Speech Has Been Specifically Immunized by Act of Congress* .............................................................................................................................11

     *D. A Prior Restraint is Particularly Inappropriate Since Plaintiffs' Claims Lack Merit as a Matter of State Law* ...........................................................................................13

Joshua Koltun ATTORNEY

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58, 70 (1963) .................................................................................................................. 9

*Barrett v. Rosenthal,*
  40 Cal.4th 33, 57-58 (2006) ......................................................................................................... 12

*Batzel v. Smith,*
  333 F.3d 1018, 1020 (9th Cir. 2003) ..................................................................................... 12, 13

*Bondi v. Grant Thornton Int'l (In re Parmalat Securities Litigation),*
  421 F. Supp.2d 703, 714 (D.N.Y. 2006) ..................................................................................... 12

*Carroll v. President & Commissioners of Princess Anne Cty,*
  393 U.S. 175, 181 (1968) .............................................................................................................. 9

*Cf. Planned Parenthood Golden Gate v. Garibaldi,*
  107 Cal.App.4th 345, 349 (2003) .................................................................................................. 6

*Elrod v. Burns,*
  427 U.S. 347 (1976) .................................................................................................................... 10

*Florida Star v. BJF,*
  491 U.S. 524, 541 (1989) ............................................................................................................ 10

*In re Portnoy,*
  201 B.R. 685 (Bankr. S.D.N.Y. 1996) ........................................................................................ 11

*Korea Supply Co. v. Lockheed Martin,*
  29 Cal.4th 1134, 1147-48 (2003) ................................................................................................ 15

*Lamont v. Postmaster Gen.,*
  381 U.S. 301, 308 (1965) .............................................................................................................. 7

*Madsen v. Women's Health Ctr. Inc.,*
  512 U.S. 753, 756-66 (1994) ........................................................................................................ 9

*McIntyre v. Ohio Elections Commission*
  (1995) 514 U.S. 334 .................................................................................................................... 12

*NAACP v. Button,*
  371 U.S. 415, 432 (1963) .............................................................................................................. 7

*Near v. Minnesota,*
  283 U.S. 697 (1931) ...................................................................................................................... 9

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539, 559 (1976) .............................................................................................................. 9

Joshua Koltun ATTORNEY

*New York Times Co. v. United States*,
  403 U.S. 713 (1971) .......................................................................................................... 10

*Nissan Motor Co. v. Nissan Computer Co.*,
  378 F.3d 1002 (9th Cir. 2004) ........................................................................................... 14

*Organization for a Better Austin v. Keefe*,
  402 U.S. 415 (1971) ............................................................................................................ 9

*Pearson v. Dodd*,
  410 F.2d 701, 708 (DC Cir. 1969) .................................................................................... 15

*Perfect 10, Inc. v. CC Bill LLC*,
  481 F.3d 751, 767-68 (9th Cir. 2007) .......................................................................... 12, 13

*Rancho Publications v. Super. Ct.*
  (1999) 68 Cal.App.4th 1538 .............................................................................................. 12

*See, e.g., Levin v. McPhee*,
  119 F.3d 189, 197 (2d. Cir. 1997) ..................................................................................... 14

*See, e.g., Bartnicki v. Vopper,*
  532 U.S. 514, 527 (2001) .................................................................................................. 10

*See, e.g., ComputerXpress v. Jackson*, 93
  Cal.App.4th 993, 1011 (2001) .......................................................................................... 11

*See, e.g., Goldberg v. Lawrence,*
  227 B.R. 907, 917 (Bankr.D.Fla 1988) ............................................................................. 11

*See, e.g., In re Berry*,
  68 Cal. 2d 137, 151 (1968) .................................................................................................. 7

*See, e.g., Kleindienst v Mandel,*
  408 U.S. 753, 762 (1972) .................................................................................................... 7

*Thornhill v. Alabama*,
  310 U.S. 88, 97-98 (1940) ................................................................................................... 7

*Zeran v America Online,*
  129 F3d 327, 333 (4th Cir. 1999) ...................................................................................... 12

**Statutes**

Communications Decency Act, Section 230 .......................................................................... 2, 12

**Rules**

Federal Rule of Civil Procedure 65(d)(2)(C) .................................................................................... 7

Rule 4(h)(1)(B) of the Federal Rules of Civil Procedure ................................................................ 5

**Other Authorities**

*Tax Haven Abuses: The Enablers, the Tools and Secrecy,*
  U.S. Senate Comt. on Homeland Security and Governmental Affairs,
  Permanent Subcommittee on Investigations (2006) ......................................................... 11

*Smolla and Nimmer on Freedom of Speech* (2007) at p. 15-14.4-15-14.5 .................................... 9

Joshua Koltun ATTORNEY

*INTRODUCTION AND SUMMARY OF ARGUMENT*

Daniel Mathews is an individual who has been served with the Amended Temporary Restraining Order and Order to Show Cause ("TRO") in this action, purportedly on the grounds that he is an "officer" of Wikileaks. As explained below, he is not, nor does he have any involvement in the administration or management of the Wikileaks server(s) or software. He had no involvement in the leaking of the Julius Baer documents.

Wikileaks guarantee of anonymity to "leakers" of documents is an essential tool for human rights and anti-corruption analysts and others to gather information about repressive regimes. Mathews is an activist, scholar and writer who volunteered to analyze documents leaked to Wikileaks. He and others analyzed, for example, documents concerning a faction seeking to establish an Islamic Republic in Somalia and concerning government corruption in Kenya.

The TRO is very broadly and vaguely worded – particularly when one considers the manner in which Wikileaks' collaborative "wiki" software allows persons such as Mathews to contribute to the creation of the site's text. The TRO and the Permanent Injunction restrain, inhibit and chill human rights activists such as Mathews from continuing to contribute to the Wikileaks site. The Court's injunctions constitute a prior restraint on First Amendment activity, and therefore carry a "heavy presumption" that they are unconstitutional.

The crowning irony is that Plaintiffs – who purport to be shocked, *shocked* that Wikileaks has promised anonymity to leakers – are a Swiss bank and its Cayman Island subsidiary. They have brought this case to protect the "privacy" of their customers (although they also vaguely allege that an unspecified number of these documents are "forged"). No doubt the bank secrecy laws of Switzerland and the Cayman Islands are regarded as sacred in those countries – which is precisely what enables such offshore tax havens to offer the ability to hide assets from the prying eyes of creditors, taxing authorities, and courts. But American courts need not be especially solicitous of this "privacy" interest, let alone deem it to be so compelling as to overcome the "heavy presumption" against prior restraints.

A prior restraint is particularly unjustified here, since Congress has made a considered policy

-1-

Daniel Mathews Opp. To TRO, Prelim Inj., Perm.Inj.                                                                        CV08-0824 JSW

Joshua Koltun ATTORNEY

decision under section 230 of the Communications Decency Act to immunize internet users such as Mathews and other Wikileaks contributors against liability for content created by third parties.

Mathews respectfully urges the Court to immediately lift the injunctions.

## *FACTUAL AND PROCEDURAL BACKGROUND*

Daniel Mathews is a mathematics graduate student at Stanford University with a longstanding interest and involvement in human rights activism. *Id.,* ¶ 1. He also earned a law degree in Australia, his native country. When he learned that a project called "Wikileaks" claimed to "be developing an uncensorable Wikipedia for untraceable mass document leaking and analysis" he believed the project was an important tool for human rights and anti-corruption activists. *Id.* Mathews was interested in volunteering some of his time and energy as a scholar, activist and writer to analyzing the authenticity and significance of purportedly "leaked" documents with potential human rights implications. *Id.*

As noted in the TRO, there are a large number of domain names that contain the term "Wikileaks," all of which resolve to the same "Wikileaks" website. TRO at ¶ 3:1-4. Prior to its being taken down by this Court's permanent injunction, the "Wikileaks.org" name was by far the most commonly used domain name. Mathews Decl., ¶ 3. "Wikileaks" is a website that uses wiki software. Wiki software allows users to create, edit, and link web pages easily, and enables the creation of collaborative websites. *Id.* Wiki software enables the creation of a website in which any member of the public can create pages, as well as enabling members of the public to delete or modify pages created by others. *Id.* Websites employing such software (and there are different versions of such software) are often themselves referred to as *wikis. Id.* Wikipedia, an online encyclopedia, is one of the best known wikis, but there are many other wikis. *Id.*

The Wikileaks project, as Mathews understood it, was primarily designed to provide a wiki that whistleblowers and human rights activists could use to anonymously leak documents with important human rights implications to the public. *Id.,* ¶ 4. Anonymity is essential to the project since in many repressive regimes, any such whistleblower would face severe reprisals for disclosing human rights violations or other government wrongdoing, such as, for example, misuse of Western aid. *Id.; see also* Declaration of Nicole Fritz (director of human rights center in Johannesburg

- 2 -

testifying to the severe risks faced by whistleblowers and human rights workers, the lack of legal means to secure information about wrongdoing and abuses, and the potential utility of anonymous conduits such as Wikileaks in remedying these shortcomings).

At the same time, however, a necessary corollary of such anonymity is that it is difficult to determine whether any purported "leak" is authentic, or to determine the significance of such a document. *Id., ¶ 5.* The power of a wiki is that it provides not only the mechanism to leak the document, but also a forum for any member of the public who may have knowledge relevant to the "leak" to critique, debunk, and analyze the document for this purpose. *Id.* Allowing such critiques and analyses to be submitted anonymously enables knowledgeable people who themselves may reside under the regime to provide valuable information with which to evaluate and understand such "leaks," if indeed that is what they are. *Id.* As the Wikileaks site explains, "If a document comes from the Chinese government, the entire Chinese dissident community and diaspora can freely scrutinize and discuss it; if a document arrives from Iran, the entire Farsi community can analyze it and put it in context." *Id.*

Thus, as documents appeared through Wikileaks which were interesting to Mathews, he occasionally contributed to analyses and articles about them, when he had the time and energy. Mathews Decl. at ¶ 6. In 2006, a document was leaked to Wikileaks that was purportedly written by Sheik Aweys, a leader of the Union of Islamic Courts, one of several entities that had been vying for power in the Somali civil war. *Id.* On its face, the document proclaimed an Islamic Republic in Somalia, and stated that "whosoever leaks this information and is found guilty should be shot." *Id.* at ¶ and Exh. A. Mathews, along with others, wrote an analysis of the document in the context of the larger Somali political situation, including an analysis of whether the document was authentic. *Id.* A version of the article largely written by Mathews is still posted on the Wikileaks website. *Id.* In the nature of a wiki, the article may have been edited by others since it was originally posted, although it appears that any editing was minor. *Id.* Said S. Samatar, Professor of African History at Rutgers University, said "This is a remarkably well researched and written piece. Informative, lucid and incisive." *Id.*

In 2007, a document was leaked to Wikileaks that showed the extent to which the family and

- 3 -

Daniel Mathews Opp. To TRO, Prelim Inj., Perm.Inj.                                        CV08-0824 JSW

1  associates of the former Kenyan President Daniel Arap Moi had siphoned off over two billion dollars
2  of state money into a web of shell companies, secret trusts and frontmen in countries around the
3  world, including the Cayman Islands and Switzerland.  *Id.* at  ¶ 7 and Exh. B.  The report had been
4  commissioned by the President of Kenya, Mwai Kibaki, but had later been suppressed and had never
5  been released publicly.  *Id.*   Mathews and others contributed to an analysis of the document and of
6  corruption in Kenya that concluded that the document was genuine.  *Id.*   The leaked documents and
7  the resulting story were widely reported in the international media.  *Id.*  The documents (and the
8  failure to publicly release them) discredited President Kibaki's pledge to turn a new leaf in rooting out
9  corruption.  *Id.*

10          Mathews had no involvement in the leaking of the Julius Baer documents.  *Id., ¶* 8.   He has
11  not commented on or edited these documents.  *Id.*  He never read any of the Julius Baer documents,
12  until he was served with some of them as attachments to the Complaint, at which point he only
13  skimmed them.  *Id.*  He does not know who submitted the documents to Wikileaks other than Julius
14  Baer's contention that they were submitted by Rudolf Elmer.

15          The Wikileaks site claims that it uses generally available wiki software combined with
16  elements of cryptographic software to mask the identities of those who wish to submit documents.
17  *Id., ¶* 9.   Mathews is not a software engineer or programmer and has no relevant technical
18  programming or networking skills or knowledge.  *Id.*  He does not know what software is actually
19  used on the Wikileaks site(s), nor does he know whether the cryptographic capabilities of the software
20  are as advertised.  *Id.*  He does not know where the servers are that run any of the Wikileaks wiki
21  software, although he has read news reports indicating that the servers are in Sweden.  *Id.*  He does not
22  know who is in control of these servers.  *Id.*   There are many domain names that resolve to the
23  "Wikileaks" website, some of which contain the name "Wikileaks" and some of which do not.  *Id.*
24  Mathews has no understanding of the technical mechanisms whereby various Wikileaks sites all
25  "mirror" each other, although he is aware that multiple "mirror" domain names were created well in
26  advance of the instant litigation, in order to help users in China evade attempts by the Chinese
27  government to block their access to the Wikileaks site.  *Id.*

28          It is Mathews' understanding that any member of the public, including Plaintiffs, can post

- 4 -

Daniel Mathews Opp. To TRO, Prelim Inj., Perm.Inj.                                           CV08-0824 JSW

1 comments regarding the Julius Baer documents, edit the documents, or delete them. *Id., ¶* 10. As far
2 as Mathews is aware, Plaintiffs have never attempted to do so. *Id.* It is also his understanding, that
3 (as with any wiki) any such commenting, editing or deleting can be easily reversed by someone else.
4 *Id.* Whoever submitted the Julius Baer documents in the first place (presumably Rudolf Elmer) can
5 always resubmit the documents. *Id.* Mathews does not have any ability to irreversibly delete the
6 Julius Baer documents, or to block the documents from being resubmitted by Rudolf Elmer or anyone
7 else. *Id.*

8 On February 13, 2008, Mathews was served via email (and also personally) with the
9 Summons, Complaint and other papers in this action. *Id., ¶* 11. The emails from Plaintiffs' counsel
10 stated that Mathews was an "WL Officer." *Id.* Mathews is not an "officer" of "Wikileaks" or any
11 other formal or informal organization responsible for the administration or management of Wikileaks.
12 *Id.* The Wikileaks site lists members of an "advisory board," but Mathews is not listed as, and is not,
13 one of them. *Id.* Mathews immediately responded that he did not know why he was being served
14 with the documents, but that he "presume[d]" plaintiffs' counsel had served him with the summons
15 "because I am a registered user of the wikileaks website and have written some material there. But I
16 have no other connection to this case, have not read the documents from Bank Julius Baer which are
17 the subject of this case, have not written anything about them, and generally know very little about the
18 case." *Id.*

19 Plaintiffs' counsel responded: "Wikileaks lists you as an officer of the company on its
20 Facebook page. As an officer of a defendant in this action, my client is entitled to serve you a copy of
21 the summons and complaint pursuant to Rule 4(h)(1)(B) of the Federal Rules of Civil Procedure." *Id.*
22 Facebook is a website created for college students (and now used by others) as a social networking
23 site. *Id.* at ¶ 12. The Wikileaks website had invited people to start discussion groups on Facebook
24 and other websites. *Id.* The Facebook page at issue had identified Mathews as the "Stanford rep." of
25 the discussion group, and the Facebook term "officer" has no significance; the fact that he is an
26 "admin" merely indicated that he was a moderator of that discussion group. *Id.* Mathews responded
27 to Plaintiff's counsel: "I am an officer of a facebook group, which is essentially a message board for
28 discussion of issues relating to wikileaks. I am not, and never have been, an officer of wikileaks, and I

Joshua Koltun ATTORNEY

1  request you not to represent that I am." *Id.*  Nevertheless, on February 22, 2008, Plaintiffs counsel

2  declared to this Court that "Plaintiffs served a copy of the TRO and OSC on the Wikileaks

3  Defendants via e-mail, per the Court's prior order, … to the personal e-mail address for a listed officer

4  of Wikileaks."  Decl. of Spiegel re Notice of Non-Opposition, ¶ 4.

5      Mathews has never had any communications with Julie Turner, who Plaintiffs contend was

6  Wikileaks' attorney, about this case or any legal matter.  *Id., ¶* 13.  Mathews did not obtain legal

7  representation in this matter until after the Court's deadline to file opposition to the TRO had passed.

8  *Id.*

9

10                                  *ARGUMENT*

11

12  **I.**   *Mathews Has Standing to Challenge the Permanent Injunction and the TRO as Prior Restraints Upon His Rights and the Rights of Others to Speak and to Receive Information.*

13      Mathews has standing to challenge the TRO because it purportedly applies to him.  The TRO

14  on its face restrains "DEFENDANTS WIKILEAKS and WIKILEAKS.ORG and DOES 1-10

15  (collectively the "Wikileaks Defendants") … and all of their respective *officers ...*  website site

16  developers …  and all those in active concert or participation with the Wikileaks Defendants … and

17  all others who *receive notice of this order*."  TRO, ¶ 1 (emphasis added).   Mathews has been served

18  with the Summons, Complaint, and TRO in this action.  *Cf. Planned Parenthood Golden Gate v.*

19  *Garibaldi,* 107 Cal.App.4th 345, 349 (2003) (injunction purporting to bind "all persons with actual

20  notice of this judgment" does not bind persons who have not been personally served).  Moreover,

21  although he is not an "officer" of Wikileaks, Plaintiffs contend that he is, and given the general

22  vagueness of Plaintiffs allegations, they may contend that he is a "website site developer" as well.

23  Further adding to the confusion is that Plaintiffs have defined the term "Wikileaks Defendants" to

24  include "their respective officers."  Proposed Order Granting Preliminary Injunction at 2:21.

25  Mathews denies that he is an "officer" of Wikileaks, but as long as these issues remain in dispute

26  before this Court, the injunction has the effect or restricting and chilling his exercise of First

27  Amendment rights.  He also has standing to challenge the Permanent Injunction, as it interferes with

28  his ability to reach readers who expect to find his work at Wikileaks.org.

- 6 -

Daniel Mathews Opp. To TRO, Prelim Inj., Perm.Inj.                                          CV08-0824 JSW

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

1   Moreover, Mathews has standing to assert the rights of others whose activities might be
2   restricted or chilled by the TRO even if his own exercise of those activities were not protected.  An
3   injunction is invalid "if it prohibits privileged exercises of First Amendment rights whether or not the
4   record discloses that the petitioner has engaged in privileged conduct." *NAACP v. Button*, 371 U.S.
5   415, 432 (1963).  The Court may consider possible applications outside the factual contexts presented
6   in the case.  *Id.; accord Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940).[1]

7   Moreover, Mathews may challenge any aspect of the OSC that has the ***potential*** to restrict his
8   speech, since it "cannot [be] assum[ed] that, in its subsequent enforcement, ambiguities will be
9   resolved in favor of adequate protection of First Amendment rights. …. Precision of regulation must
10  be the touchstone in an area so closely touching our most precious freedoms." *NAACP,* 371 U.S. at
11  438.

12  Thus, for example, even though the TRO's language "in active concert or participation" is
13  used in the Federal Rule of Civil Procedure 65(d)(2)(C), as applied to the facts of this case such
14  terminology creates an unconstitutional uncertainty as to the potential scope of the TRO.  Human
15  rights activists such as Mathews are left to wonder whether any of their activities on the Wikileaks
16  sites – posting comments or analyses of documents, or editing the comments of others, will be deemed
17  to constitute "active concert or participation" so as to bring them within the scope of the Court's
18  injunction.  *See, e.g., In re Berry*, 68 Cal. 2d 137, 151 (1968) (injunction barring "all persons in active
19  concert or participation with" named Defendants from picketing or similar labor activities held to be
20  unconstitutionally vague.").

21  By the same token, the TRO orders persons subject to it to "remove [the Julius Baer
22  Documents] from the Wikileaks websites, including any other websites owned or operated by the
23  Wikileaks Defendants *or within their control*." TRO at 3:19 (emphasis added).   The emphasized
24  words are impermissibly vague on the facts of this case, since it is in the nature of wiki software to
25  provide *any member of the public* some level of control over the website.   Similarly, the TRO's

---

[1] As discussed at greater length by those who have sought leave to intervene or file *Amici* briefs, the First Amendment protects not only the right to speak but also the right to ***receive*** information.  *See, e.g., Kleindienst v Mandel,* 408 U.S. 753, 762 (1972); *Lamont v. Postmaster Gen.,* 381 U.S. 301, 308 (1965).

- 7 -

requirement that all persons subject to the order "give notice of this Order to … anyone *responsible [sic] or with access to modify* the website …" is ambiguous for the same reason, and potentially applies to any member of the public.  TRO at 3:25-26.  Further confusion is engendered when those ambiguous references are read in conjunction with the TRO's command to "immediately block and otherwise prevent any current or future use" of the Julius Baer documents (TRO 3:11-12), enjoining the "distributing, *linking to*, or otherwise providing *any information for the access or other dissemination*" of the Julius Baer Documents "and any information or data contained therein, including on [listing multiple "mirror sites" established by Wikileaks prior to this litigation], and any other websites under their ownership, control *and/or [sic] which they can post or edit any content.*" TRO at 2:25-3:4 (emphasis added).

Particularly in light of the Permanent Injunction's disabling of the most commonly known domain name of Wikileaks, Wikileaks.org, the cumulative result of these aspects of the TRO is to chill Mathews and other human rights activists from exercising their right to continue to post and contribute to analyses of documents on Wikileaks (quite apart from the Julius Baer Documents), because any communication that assists people in finding the Wikileaks website is purportedly barred by the TRO.  Mathews is barred, for example, from directing anyone interested in learning about the current contested election and civil strife in Kenya to his own published Wikileaks research into President Kibeki's record on corruption.  Although Plaintiffs concede that there are documents on Wikileaks that they do not contend were "wrongful[ly]" posted, and "do not contend that [such documents] should be removed," Memo.P.A. at 8:20-21, 10:3-8; Hiestand Decl. at ¶ 27, this concession is worthless.  In fact, the vague language of the TRO has the practical effect of inhibiting anyone might wish to post, edit, or analyze *any* documents on Wikileaks or invite others to do the same.

**II.     *The Injunctions Impose an Impermissible Prior Restraint on Mathews and Others Who Seek To Contribute To, and Communicate Through, the Wikileaks Site***

   A.     *Prior Restraints On Speech Face a "Heavy Presumption of Invalidity."*

The injunctions at issue here are classic prior restraints, "the most serious and least tolerable

- 8 -

infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976); *Near v. Minnesota*, 283 U.S. 697 (1931) (overturning as unconstitutional an injunction "abating" a "malicious, scandalous, and defamatory" periodical and restraining future publication); *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971).  As such, the injunctions carry "a 'heavy presumption' against [their] constitutional validity." *Id.* at 419 (citing *Carroll v. President & Commissioners of Princess Anne Cty*, 393 U.S. 175, 181 (1968); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  "When a prior restraint is issued by a court, there is a special *in terrorem* effect to the judicial order that does not exist in the case of subsequent punishments.  Because of the consequences of the 'collateral bar rule' and the power of contempt of court as punishment for disobedience of court orders, judicially imposed prior restraints have an uncommonly potent capacity to infringe on First Amendment Rights."  Rodney Smolla, *Smolla and Nimmer on Freedom of Speech* (2007) at p. 15-14.4-15-14.5.

A temporary restraining order "issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' In other words, the order must be tailored as precisely as possible to the exact needs of the case." *Carroll*, 393 U.S. at 183-184 (internal citations and quotation marks omitted); *accord Madsen v. Women's Health Ctr. Inc.,* 512 U.S. 753 (1994).

### B.  The Interest of Offshore Tax Havens In Maintaining Bank Secrecy Cannot Possibly Constitute A Sufficient Interest to Impose a Prior Restraint

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-374 (1976) (*citing New York Times Co. v. United States*, 403 U.S. 713 (1971).  The *New York Times* case involved leaking of an important classified set of documents (the so-called "Pentagon Papers") at the height of the Vietnam War.  The United States sought to enjoin the New York Times and Washington Post from publishing the contents of these papers.  *Id.*  The case made its way to the United States Supreme Court with

- 9 -

great haste. *Id.* The Court concluded that the United States had not carried its burden of showing that a prior restraint upon the newspapers was warranted. *Id.* Significantly, this was so even though, as several concurring Justices suggested in dictum, the newspapers themselves might well have been prosecuted for the leaks under the Espionage Act. *Id.,* 403 US at 730 (Stewart, J. concurring), 733 (White J concurring), 748 (Marshall, J. Concurring).[2]

Thus, to defeat the "heavy presumption" against prior restraints, the Julius Baer Banks must convince this Court that the banking secrecy laws of offshore tax havens are a more compelling interest than the espionage statutes aimed at protecting the national security secrets of the United States. That proposition, of course, is absurd. To the contrary, offshore tax haven secrecy laws are *inimical* to the public interest – the purpose of such laws is manifestly to enable persons to hide assets from the reach of creditors, the Internal Revenue Service, and the United States Courts.[3] *See, e.g., Goldberg v. Lawrence,* 227 B.R. 907, 917 (Bankr.D.Fla 1988) (Debtor is unfortunately "apparently not alone in his belief" that "hide-the-ball, 'catch me if you can' conduct" is acceptable. "There is a growing body of case law surrounding debtors who have secreted their assets in distant jurisdictions with laws which would make the stereotypical Swiss banker proud."). A United States Court need not apply offshore laws that, as applied, offend the public policy of the United States. *Id.* (*citing In re Portnoy,* 201 B.R. 685 (Bankr. S.D.N.Y. 1996)). *A fortiori,* a United States cannot impose a prior restraint where the sole justification therefore is an assertion that publication would violate the secrecy

---

[2] In fact, under current jurisprudence, a publisher of information that was unlawfully acquired by a third party, where the publisher did not itself participate in any violation of the laws, may well be immune from liability under the First Amendment. *See, e.g., Bartnicki v. Vopper,* 532 U.S. 514, 527 (2001); *Florida Star v. BJF,* 491 U.S. 524, 541 (1989). There is no need to reach that issue at this stage of the proceedings, since the question is not the ultimate liability of any defendant but the (much easier) question whether a prior restraint is warranted. Moreover, as discussed further below in section II.B. below, in the specific context of the internet Congress has barred liability for the publication of content provided by a third party.

[3] Insofar as the Julius Baer Banks complain about a loss to their "reputations," MPA at 19:8, they would appear to be referring to the loss of their reputation as an offshore tax haven wherein a client may shield its assets from scrutiny by creditors or revenue authorities. For the reasons stated above, this interest is contrary to U.S. public policy, and in any event insufficient to support a prior restraint. The record also includes assertions that, among the leaked documents were "altered and/or forged or semi-forged 'leaked' documents," without further explanation or specificity. *Heiland Decl.,* ¶ 24. Such cagey and vague assertions are insufficient to show liability for false statements (let alone support a prior restraint). *See, e.g., ComputerXpress v. Jackson*, 93 Cal.App.4th 993, 1011 (2001) (no claim for trade libel shown where plaintiffs have not "even identified which of the numerous postings included in the record it contends were actionable. Instead, [plaintiff] simply refers this court to the 131 pages of Internet postings contained in the record, apparently assuming it is the court's obligation to determine how they support [plaintiffs'] position.").

laws of an offshore tax haven.  *See also: Tax Haven Abuses: The Enablers, the Tools and Secrecy,* U.S. Senate Comt. on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations (2006) (available at www.senate.gov/~levin/newsroom/supporting/2006/PSI.**taxhavenabuses**.080106.pdf)  at, *e.g.,* 2 n.5 ("this Subcommittee took testimony from a U.S. owner of a Cayman Island offshore bank who estimated that 100% of his clients were engaged in tax evasion, and 95% were U.S. citizens") ; *Cf.* USCS Appx § 2B1.1(8)(B) imposing a sentencing enhancement where a 'sophisticated means' is employed, to wit: "especially intricate offense conduct pertaining to the execution or concealment of an offense, [f]or example, conduct such as hiding assets or transactions, or both, through the use of … offshore financial accounts also ordinarily indicates sophisticated means."); *Bondi v. Grant Thornton Int'l (In re Parmalat Securities Litigation)*, 421 F. Supp.2d 703, 714 (D.N.Y. 2006) (persons aiding and abetting company insiders in "setting up offshore companies in financial secrecy havens whose basic purpose was to engage in transactions designed to hide Parmalat's mounting losses, and to siphon off billions of dollars and euros from the company into their own pockets" may be liable for same); *Hiestand Decl,* Exh. D, p. 113 (Wikileaks page summarizing leaked document purporting to describe individual as concealing money in a Cayman Island trust, noting that an initial investigation of that document ***does not*** harmonize with information about that individual, and that the responsible tax investigation unit in Germany has been notified.).[4]

### C.     There Cannot Be a Compelling Interest In Restraining Mathews' or Others' Speech Where, as Here, Such Speech Has Been Specifically Immunized by Act of Congress

Plaintiffs cannot assert a compelling interest in restraining Mathews' speech because the speech at issue here (i.e. of speakers other than the poster of the Julius Baer documents) has been specifically immunized by Act of Congress. Congress "has chosen for policy reasons to immunize from liability for defamatory or obscene speech  'providers and users of interactive computer services' when the defamatory or obscene material is 'provided' by someone else." *Batzel v. Smith,* 333 F.3d

---

[4] While there is no compelling public interest in protecting anonymity of those who would secrete assets in offshore havens, the First Amendment does protect the right to ***speak*** anonymously.  *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 341-343  (1995); *Rancho Publications v. Super. Ct.* 68 Cal.App.4th 1538, 1547 (1999).

- 11 -

1    1018, 1020 (9th Cir. 2003).  This immunity is contained in Section 230 of the Communications

2    Decency Act, ** which provides that "No *provider or user* of an interactive computer service shall be

3    treated as the publisher or speaker of any information provided by another information content

4    provider."[5]  47 USC § 230(c ) (emphasis added).  Congress' purpose was twofold: to encourage "the

5    unfettered and unregulated development of free speech on the Internet, and to promote the

6    development of e-commerce" and to "encourage interactive computer services and users of such

7    services to self-police the Internet for obscenity and other offensive material."  *Id.* at 1029*; Zeran v*

8    *America Online,*  129 F3d 327, 333 (4th Cir. 1999).  In *Batzel*, for example, the court held that the

9    moderator of a listserv and operator of a website is immune from liability for posting an allegedly

10   defamatory e-mail authored by a third party and transmitted to them for the purpose of having such

11   email posted.  *Id.,* 333 F.3d at 1020.

12          This immunity extends to ***any*** state law claims arising from the publication on the internet by

13   any "provider or user" of content prepared by a third party.  *Perfect 10, Inc. v. CC Bill LLC*, 481 F.3d

14   751, 767-68 (9th Cir. 2007) (statutory exception for "intellectual property" ***does not*** apply to any state

15   law claims no matter how characterized).   There is no exception to the immunity on the grounds that

16   plaintiff has put the publisher "on notice" of the wrongfulness of the claim.  *Barrett v. Rosenthal,* 40

17   Cal.4th 33, 57-58 (2006).

18          Wikis encourage members of the public to edit and revise content created by others.   Put

19   simply, section 230 means that persons who post content on wikis are responsible for their own

20   content, not for the content posted by others.  To be sure, at some point if one heavily edits the content

21   posted by another, that may amount to the creation of new content.  *Compare Batzel,* 333 F.3d at

22   1031. ("Obviously, Cremers did not create Smith's e-mail. Smith composed the e-mail entirely on his

23   own. Nor do Cremers's minor alterations of Smith's e-mail prior to its posting or his choice to publish

24   the e-mail (while rejecting other e-mails for inclusion in the listserv) rise to the level of

---

[5] An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *47 U.S.C. § 230(e)(3).*

- 12 -

Daniel Mathews Opp. To TRO, Prelim Inj., Perm.Inj.                                                                      CV08-0824 JSW

"development."). But where, as here, the allegedly wrongful documents posted by the third party have not been altered at all, neither the "users" nor the "provider" can possibly be liable.[6]

Thus both Wikileaks and Dynadot are immunized from any liability for the third-party posting of the Julius Baer Documents. Significantly, Plaintiffs' claims are framed entirely in terms of California law claims. As such they are barred by Section 230. *Perfect10,* 481 F.3d at 767-68. By the same token, Mathews in completely immunized from liability. The fact that he (or any other person) has any ability to edit content on a site cannot give rise to any legal duty to do so, let alone a judicially imposed prior restraint requiring him to do so. *A fortiori,* there can be no liability for "linking to and/or otherwise providing any information for the access or other dissemination of copies of and/or images of the JB Property," (TRO at 2:25-28) insofar as this is done by hyperlinking or otherwise informing people about the many "mirror" domain names that resolve to the Wikileaks site. (Hyperlinking simply amounts to telling another internet user the domain name of a website). *See also Nissan Motor Co. v. Nissan Computer Co.,* 378 F.3d 1002, 1016-18 (9th Cir. 2004) (First Amendment bars the issuance of an injunction prohibiting party from hyperlinking to defamatory websites).

Dynadot apparently hastily stipulated to the permanent injunction for the sole purpose of avoiding having to defend a frivolous lawsuit. Dynadot's immaterial interest in avoiding frivolous litigation cannot be allowed to trump the reasonable expectation of Mathews and others who have been communicating to the public through the Wikileaks.org website to continue to be able to do so at that well-known and and recognized domain name address.

D. ***A Prior Restraint is Particularly Inappropriate Since Plaintiffs' Claims Lack Merit as a Matter of State Law***

Since Plaintiffs' claims arise under state law and are all barred under section 230, it is

---

[6] However, insofar as anyone posts or edits text on Wikileaks attempting to analyze whether a given document is authentic, or attempting to determine the documents' significance, that posting is likely to be constitutionally protected opinion. *See, e.g., Levin v. McPhee*, 119 F.3d 189, 197 (2d. Cir. 1997) (speculation or conjecture about a mystery is protected opinion, so long as it is not presented as being based on undisclosed facts within the knowledge of the speaker); *see Hiestand Decl,* Exh. D, p. 113 (Wikileaks page summarizing leaked document purporting to describe individual as concealing money in a Cayman Island trust, noting that an initial investigation of that document ***does not*** harmonize with information about that individual, and that the responsible tax investigation unit in Germany has been notified.)

- 13 -

Daniel Mathews Opp. To TRO, Prelim Inj., Perm.Inj.                                    CV08-0824 JSW

1 unnecessary to decide whether they they succeed as a matter of state law. Nevertheless, it is worth
2 noting that they do not, and that they certainly lack merit as to Mathews.

3     Whether or not certain documents are "proprietary" in the sense of confidential, the copying of
4 these documents, or the transmission of information contained within them, does not constitute
5 "conversion." "The question here is not whether appellee had a right to keep his files from prying
6 eyes, but whether the information taken from those files falls under the protection of the law of
7 property[;] … it does not." *Pearson v. Dodd,* 410 F.2d 701, 708 (DC Cir. 1969).

8     Nor do Plaintiffs state a claim under Business & Professions Code Section 17200 *et seq*
9 ("Section 17200"). Section 17200 does not provide for compensatory damages, only for restitution.
10 *Korea Supply Co. v. Lockheed Martin,* 29 Cal.4th 1134 (2003); Section 17203 (court may make any
11 order "necessary to restore to any person in interest any money or property, real or personal, which
12 may have been acquired by means of such unfair competition"); *accord* Section 17535. After passage
13 of Proposition 64 in 2004, a plaintiff has no **standing to bring suit** unless it alleges that it "suffered
14 injury in fact **and** has lost money or property as a result of the unfair competition." Amended Section
15 17204 (emphasis added). Since the copied images of documents or the contents thereof are not
16 "property," *see Pearson, supra,* plaintiffs cannot show that they have "lost money or property." Thus
17 Plaintiffs have no standing to sue under section 17200.

18     By the same token, Plaintiffs do not and cannot contend that Mathews had any knowledge of
19 the employment contract with the (presumed) poster of the Julius Baer Documents, or of any
20 prospective economic advantage to be lost by the Julius Baer Banks as a result of the posted
21 Documents. Nor have they shown the existence of any state law duty on Mathews' part (or on the
22 part of any person) to remove the postings, particularly insofar as doing so would not prevent the
23 poster from simply reposting them, on Wikileaks or, for that matter, on Wikipedia, or on any of the
24 innumerable sites upon which one can post documents or images. In this case, the fact that Wikileaks
25 may provider greater anonymity to posters than other sites is irrelevant. Here, Plaintiffs have no
26 doubt that the leaker is Rudolf Elmer, a person with whom they have been engaged in numerous civil
27 and/or criminal proceedings in Switzerland and other foreign jurisdictions. This dispute should be
28 carried out in the context of those foreign proceedings against Elmer, not by asking this Court to issue

extraordinary and unconstitutional relief against other third parties such as Mathews and Wikileaks.

### *CONCLUSION*

Plaintiffs have failed to meet their "heavy presumption" against the constitutionality of the prior restraints they have requested. Mathews respectfully urges that Court deny the preliminary injunction and suspend the permanent injunction.

DATED: February 28, 2008

/s/
_____
Joshua Koltun
Attorney for purported "Related Third Party"
and/or purported Defendant Daniel Mathews